# 2002 DTA 84

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL IV DE AGUADILLA Y MAYAGUEZ
PANEL I**

ENRIQUE PAGAN BEAUCHAMP Y OTROS
Demandantes-Apelantes

v.

HEWLETT PACKARD COMPANY, ET ALS.
Demandados-Apelados

Núm. KLAN-01-00312

San Juan, Puerto Rico, a 9 de abril de 2002

Panel integrado por su Presidenta, la Juez López Vilanova,
el Juez Córdova Arone y la Juez Feliciano Acevedo

López Vilanova, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El 2 de abril de 2001, se interpuso ante este Tribunal el recurso de epígrafe. Se recurre de una sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de Aguadilla (Hon. Lucy I. Rivera Doncell, J.), mediante la cual se declaró no ha lugar la acción de daños y perjuicios, despido injustificado y discriminatorio incoada por los aquí apelantes. Luego de un extenso trámite apelativo, las partes culminaron la exposición narrativa. Con el beneficio de ésta y sus alegatos, resolvemos

### I

Enrique Pagán Beauchamp e Hilda Avilés Ramos ("*Sr. Pagán Beauchamp*" y "*Sra. Avilés Ramos*", respectivamente) por sí y en representación de la sociedad legal de bienes gananciales compuesta por ambos, instaron una acción de daños y perjuicios, despido injustificado y discriminatorio contra Hewllet Packard Company ("*Hewllet Packard o compañía*"), Jesús Ramos, Waldemar L. Ramírez y Edgardo Pérez. Alegaron que no existía razón legal alguna que justificara el despido del Sr. Pagán Beauchamp, así como que el mismo fue motivado por razón de una incapacidad mental que éste padecía, lo que constituyó un discrimen prohibido tanto por el "*Americans with Disabilities Act*", 42 U.S.C. sec. 12101 *et seq.*, como por la Ley Núm. 44 de 2 de julio de 1985, 1 L.P.R.A. secs. 501 *et seq.* Sostuvieron, además, que el patrono incumplió con su obligación de reservarle al Sr. Pagán Beauchamp su puesto de trabajo mientras éste recibía tratamiento en el Fondo de Seguro del Estado ("*Fondo*"). En cuanto a la Sra. Avilés Ramos, se invocó una acción accesoria al amparo del Artículo 1802 del Código Civil, reclamando una indemnización por las graves angustias que alegadamente le ocasionó el despido de su esposo.

Por su parte, los demandados señalaron que el alegado impedimento del Sr. Pagán Beauchamp no influyó en nada en la decisión de despedirle y que, por el contrario, el despido se fundamentó en su incapacidad para realizar sus labores eficientemente, a pesar de las diversas oportunidades que se le concedieron. Además, indicaron que Hewllet Packard no tenía obligación alguna de reservarle el puesto de empleo, toda vez que el Sr. Pagán Beauchamp se reportó al Fondo con posterioridad a su separación del empleo.

El 19 de enero de 2001, se dictó la sentencia apelada. El tribunal concluyó que mientras laboró para la compañía, el Sr. Pagán Beauchamp no sufría de enfermedad siquiátrica alguna y que al despedirle no se discriminó en su contra por razón del supuesto impedimento mental, sino que, por el contrario, su despido estuvo justificado en su ineficiencia para desempeñar las funciones inherentes a su cargo, así como por haber protagonizado un incidente "*violento*" dentro de los predios de la compañía. Al respecto, expresó:

"63. *De la prueba presentada y la credibilidad que nos mereció la misma, surge que previo a su despido el demandante no tenía historial siquiátrico, ni había sido diagnosticado con enfermedad mental alguna. De igual forma, del expediente de enfermería del demandante no se desprende, ni es razonable inferir, que el demandante sufriera de enfermedad mental significativa alguna mientras trabajaba para la demandada.*

64. *De la prueba surgió que el demandante no tenía historial siquiátrico previo, éste nunca notificó o alegó a la Compañía que tuviera enfermedad mental alguna, ni mucho menos acomodo razonable alguno.*

65. *Luego de tener el beneficio de recibir la totalidad de la prueba, así como de escuchar el testimonio de los Sres. Waldemar Ramírez y Jesús Ramos, este Tribunal está convencido de que en las mentes de los gerentes que tomaron la decisión de despido del demandante, no medió ánimo discriminatorio alguno.*

*66. Al tomarse la decisión de despedir al demandante ... [ninguna de las personas involucradas] en la decisión de despido tenía conocimiento de que el demandante tuviera condición mental o física de naturaleza alguna que le impidiera realizar su labor. Estos [sic] no solicitaron el expediente de enfermería para revisarlo, por lo cual el mismo no fue parte de la decisión y, aun de haberlo revisado, el mismo no contenía información de que el demandante tuviese incapacidad mental alguna.*

*67. ... lo cierto es que ... despidieron al demandante por razones no discriminatorias, consistentes en el historial de ineficiencia en el desempeño, su falta de mejoría luego de recibir mejoría escrita, y el comportamiento preocupante exhibido por éste en las semanas previas a su despido; siendo determinante su actitud amenazante y agresiva hacia la Sra. Gutiérrez del 5 de mayo de 1997."* Apéndice del Recurso, pág. 567.

En su elaborada y bien fundamentada sentencia, el Tribunal recurrido resumió la prueba que tuvo ante sí. La exponemos.

*"La prueba documental y testifical en este caso establece claramente que el demandante reflejaba una actitud de no desempeñar satisfactoriamente los deberes asignados para su posición. La evidencia demuestra que el demandante necesitaba continuamente la asistencia de supervisores y compañeros para lograr realizar su trabajo, y descansaba excesivamente en esa asistencia para realizar tareas esenciales de su posición. De igual forma, el demandante nunca logró dominar las funciones elementales de su posición, ni demostraba tener los conocimientos y destrezas para llevar a cabo las tareas que le eran encomendadas.*

*Al ser objeto de un descenso de su posición inicial de analista de inventario pasando a ocupar una posición de menor complejidad, el demandante tampoco demostró poder desempeñarse eficientemente.*

*Conforme a los hechos del presente caso, tenemos que la permanencia del demandante en la empresa para el momento de su descenso se debió única y exclusivamente a que la empresa le dio a éste la oportunidad de aceptar otra plaza, a lo cual el patrono no estaba obligado, puesto que tenía disponible la opción de despedirlo por la ineficiencia exhibida hasta ese momento. Tan sólo la buena voluntad de sus supervisores ... [había] evitado su despido por ineficiencia.*

*A pesar de que fue descendido a una posición más simple, el demandante no pudo aprovechar la oportunidad otorgada, y nunca pudo desempeñarse eficientemente en su nueva posición.*

*Durante la vista, el demandante intentó refutar éste [sic] hecho haciendo referencia a su evaluación de nivel 3 en la última evaluación que preparó el Sr. David Bland para el demandante ... No obstante, el propio Sr. Bland aclaró que dicha evaluación tenía en gran medida el propósito de brindarle al demandante una motivación para que mejorara su desempeño y obtener de éste una reacción positiva; y sostuvo que dicha evaluación fue el resultado de que tuviera que intervenir una parte desproporcionalmente alta de su tiempo para lograr que el demandante hiciera su trabajo eficientemente. Dicho testimonio es cónsono con el de otros testigos que refieren las dificultades que confrontaba el demandante en realizar las funciones de su puesto por sí sólo, así como la queja de éstos con respecto al recargo de trabajo que les causaba tal situación.*

*Dicho señalamiento le fue hecho incluso por el propio Sr. Bland ... En dicho documento, el Sr. Bland expresó al demandante, en la parte denominada "Section Plans", que éste tenía que aprender a trabajar '... with less reliance on peers and management to provide direct on solutions to issues...'. Era éste el mismo problema de dependencia que, según refirieran otros testigos de la parte demandada, presentaba el demandante.*

*Cuando el demandante pasó a ser supervisado por el Sr. Jesús Ramos, sus problemas de desempeño fueron*

*aún más patentes, puesto que el Sr. Ramos esperaba independencia de los empleados que supervisaba, y el demandante ya no contaba con todo el tiempo que antes invertía el Sr. Bland para que éste pudiera llevar a cabo sus labores.*

*La evidencia presentada por la parte demandada estableció que el demandante no fue eficiente en sus labores como contable, y que dicha ineficiencia afectaba negativamente al resto de sus compañeros de trabajo, así como el buen y normal funcionamiento de la empresa. Así los declararon los testigos Jesús Ramos, Marisaly Piña Camacho, Claribel Rodríguez González, Rigoberto Montalvo LaFontaine, Luis Angel Nieves de Jesús, y Minerva D'Brassis, cuyos testimonios fueron consistentes, y gozaron de entero crédito por parte del Tribunal."*

....

*"Conforme la prueba desfilada, quedó demostrado que la ineficiencia del demandante era lesiva al buen funcionamiento de la empresa, pues debido al pobre desempeño del demandante y al incumplimiento de sus labores, se afectaba el flujo de información financiera a la alta gerencia y se invertían recursos excesivos al tener que realizarse por otras personas el trabajo que era de la exclusiva responsabilidad del demandante.*

*Sin embargo, no fue éste [sic] patrón de ineficiencia el único motivo para el despido del demandante. La prueba desfilada demostró que la determinación de despido fue motivada además por la conducta desplegada por el demandante luego de recibir amonestación escrita, y más aún el incidente ocurrido el 5 de mayo de 1997, en el cual el demandante actuó de forma agresiva e intimidante hacía [sic] la señora Sonia Gutiérrez.*

*Conforme a la credibilidad que nos merecieran los testimonios de los compañeros de trabajo del Sr. Pagán, así como de sus supervisores, fue evidente para este Tribunal que a raíz de la entrega de la amonestación escrita el demandante ... pasó a estar agitado, efusivo y defensivo, todo a partir del recibo de la amonestación escrita. Además, el demandante no mostró mejoría en su desempeño luego del recibo de la amonestación escrita; su comportamiento causaba gran preocupación en el personal del departamento. Dicha preocupación, sin embargo, pasó a un nivel alarmante al ocurrir el incidente protagonizado por el demandante con la Sra. Gutiérrez.*

*Este Tribunal entiende que el incidente provocado por el demandante en la mañana del 5 de mayo de 1997 fue totalmente inapropiado y preocupante. El mismo fue tan lesivo al buen y normal funcionamiento de la empresa que el patrono no tan sólo tenía jurisdicción para proceder con la acción de despido, sino que tenía además el deber de actuar inmediatamente.*

*Es un hecho probado que la conducta del demandante generó temor en la Sra. Gutiérrez, y que ésta se sintió intimidada y restringida por éste, al punto de que temió ser agredida. Aunque el demandante intentó demostrar durante la vista que dicha conducta no fue de tal seriedad, el propio testimonio del Dr. Alvarez [sic], el internista que recibió al demandante en su consultorio el mismo día de los hechos, y que fuera presentado como testigo por el propio demandante, confirma la conducta intimidante y amenazante del demandante, pues éste refirió que el demandante exhibió una conducta similar mientras se encontraba en su oficina.*

*Además de lo anterior, tanto el testimonio del Dr. Alvarez [sic] como su récord médico contradicen la versión del demandante con respecto al incidente. A pesar de que el demandante trató de minimizar el mismo durante la vista, tildándolo de una mera conversación, surge del récord del Dr. Alvarez [sic], así como del testimonio vertido por éste en la vista, que el propio demandante, al explicar las razones para su estado anímico, le refirió al Dr. Alvarez que había tenido un 'altercado' esa mañana.* \*

*\*[nota al calce: El hecho de que el Dr. Alvarez [sic]claramente indicara que el demandante le confesó*

*tener un altercado esa mañana es de suma relevancia, toda vez que el demandante mintió al negarse a aceptar que en el incidente con la Sra. Gutiérrez él estuviera agresivo, e identificó el mismo como una mera conversación. Lo declarado por el Dr. Alvarez [sic] a efectos de que el demandante mismo identificó su incidente como un altercado, demuestra que éste mintió deliberadamente durante el juicio para intentar acomodar los hechos a una versión que no le perjudique en su reclamación.]"*

....

*"...aunque en el presente caso estaban presentes circunstancias relativas al pobre desempeño del demandante que justificaban la determinación de la empresa de despedirle, el incidente en el que agresivamente agarró y restringió a una compañera empleada, justificaría de por sí su separación [del] empleo. Obviamente, al tomar en cuenta el deficiente desempeño del demandante, unido a su comportamiento agresivo e intimidante, su despido era la única alternativa viable para la empresa y hubiese constituido una imprudencia gerencial mantener a éste en su posición.*

....

*No estamos aquí ante un despido realizado por el capricho de la empresa, sino todo lo contrario. En primer lugar, la ineficiencia del demandante y su actitud de no rendir su trabajo de forma diligente justifican la decisión de la empresa. En segundo lugar, la Compañía, respondiendo a una situación que podía haber degenerado en incidentes de violencia en el lugar de trabajo, decidió actuar firme e inmediatamente.*

*Coincidimos con la posición de la parte demandada a los efectos de que no se justifica esperar que se reiterara la conducta del demandante para entonces despedirlo, pues la conducta del demandante era claramente lesiva a la paz y al funcionamiento normal de la Compañía. Era imposible para la parte demandada determinar a ciencia cierta si la conducta del demandante iba a desencadenar en conducta aún más lesiva. O inclusive en una violenta agresión; mas de no haber actuado, y de haber ocurrido una desgracia, ciertamente sería muy tarde para que el patrono reaccionara. Teniendo conocimiento de un incidente como el provocado por el Sr. Pagán con la Sra. Gutiérrez, era imperativo que el patrono actuara. Apéndice del Recurso, págs. 569, 572-573, 574-575."*

Por último, el foro *a quo* determinó que Hewllet Packard no tenía la obligación de reservarle al Sr. Pagán Beauchamp su puesto de trabajo, ya que acudió al Fondo con posterioridad a la fecha en que fue despedido. Sobre este asunto se señaló:

*"La Prueba aportada establece que el demandante no se reportó al Fondo con el fin de recibir tratamiento para su alegado padecimiento sino hasta alrededor de las dos de la tarde del 6 de mayo de 1997, esto es, un día después de haber sido despedido, y con posterioridad a una conversación telefónica sostenida con el Sr. Ramos [su supervisor inmediato], la cual el demandante identifica como el momento en que se enteró definitivamente de su despido.*

*La decisión de despedir al demandante se había tomado el día anterior, 5 de mayo de 1997, y la carta de despido se envió el mismo 5 de mayo desde Aguadilla y fue recibida en San Juan el 6 de mayo de 1997, según evidencia el matasellos en el sobre en el cual dicha carta fue enviada.*

....

*En vista de lo anterior, este Tribunal encuentra probado que cuando el demandante dejó los predios de la empresa el 5 de mayo de 1997, éste sabía que iba a ser despedido. El demandante había recibido una amonestación escrita por ineficiencia el 7 de abril de 1997, donde se le indicaba que iba a ser despedido si no*

*mejoraba en sesenta días, y no había mejorado. Si unimos esto al hecho de que el mismo 5 de mayo de 1997 por la mañana el demandante pudo ver su expediente en el escritorio del Gerente de Recursos Humanos, Sr. Waldemar Ramírez; y a que el propio demandante le consignó al Dr. Alvarez [sic] que iba a ser despedido, y que su estado de nerviosismo se debía a un 'altercado' ese día, no debe caber duda alguna que el demandante sabía que iba a ser despedido por sus actos. Más aún, el demandante retornó a la empresa por la noche y no se le permitió la entrada, lo cual debió haberle despejado cualquier duda.*

*Todos estos datos, que no están en controversia, establecen que éste recurrió al fondo luego de haber tomado conocimiento de su despido."* Apéndice del Recurso, págs. 593-594.

El foro recurrido declaró no ha lugar la acción incoada en todos sus extremos, desestimando la misma con perjuicio y ordenando su archivo definitivo, sin especial imposición de costas, gastos y honorarios de abogado.

Inconformes, acuden ante nos el Sr. Pagán Beauchamp y la Sra. Avilés Ramos mediante la oportuna interposición del presente recurso. Sostienen que el foro sentenciador incidió al concluir que tanto el despido del apelante Pagán Beauchamp estuvo justificado como que Hewllet Packard no tenía la obligación de reservarle su puesto de trabajo debido a que acudió al Fondo con posterioridad a la fecha en que fue despedido. Además, arguyen que erró dicho foro al determinar que el apelante Pagán Beauchamp no sufría de una condición que estuviera cobijada por alguno de los estatutos que proscribe el discrimen contra las personas con impedimentos en ámbito laboral, y al desestimar la causa de acción por daños y perjuicios incoada por la apelante Avilés Ramos. ▮

Posteriormente, el 8 de enero de 2002, la partes sometieron *"Exposición narrativa, parcial, estipulada de la prueba oral"*. La misma contiene lo declarado por todos los testigos, excepto Jesús Ramos, ya que no pudieron ponerse de acuerdo sobre la médula de su testimonio. Ante ello, ordenamos al tribunal de primera instancia proveer a la parte apelante de copia del testimonio prestado por Jesús Ramos durante el juicio. El 14 de marzo de 2002, le concedimos a los apelantes el término de diez días para someter la transcripción del referido testimonio. Con el beneficio de ésta, procedemos a resolver.

## II

Es un principio cardinal que los foros apelativos no intervendrán con la apreciación de la prueba efectuada por los tribunales sentenciadores, a menos que exista error manifiesto o que éstos hayan actuado movidos por prejuicio, pasión o parcialidad. Véanse *Huertas Alicea v. Compañía de Fomento Recreativo*, opinión de 4 de noviembre de 1998, **98 J.T.S. 144**, pág. 262; *Méndez v. Morales*, 142 D. P. R. 26, 36 (1996); *Rodríguez Yola v. Machado Díaz*, 136 D. P. R. 250, 258 (1994); *Benítez Guzmán v. García Merced*, 126 D.P.R. 302, 308 (1990); *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 14 (1987); *Ramos Acosta v. Caparra Dairy, Inc.*, 113 D.P.R. 357, 365 (1982); *Ortiz v. Cruz Pabón*, 103 D.P.R. 939, 946-947 (1975). Fundamento de ello, es el hecho de que los tribunales de instancia están en mejor posición para aquilatar la prueba testifical, toda vez que tienen la oportunidad de ver y observar a los testigos mientras deponen, sus gestos, dudas y contradicciones. Véanse *Figueroa v. Am. Railroad Co.*, 64 D.P.R. 335, 339 (1944); Regla 43.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 43.2. Al respecto, se ha señalado que:

*"[l]a imposibilidad de reproducir ante los tribunales de apelación o de revisión, los elementos puramente expresionales de los testimonios orales, le impuso a dichos tribunales de apelación, o de revisión, la obligación de respetar la apreciación que el juez sentenciador hiciera de aquellos elementos de credibilidad que se desprenden espontáneamente de la conducta del testigo, mientras presta declaración ante juez de hechos."*

*Sanabria v. Sucn. González*, 82 D.P.R. 885, 993 (1961). El hecho de que una parte esté insatisfecha con las determinaciones de hechos del dictamen, no es suficiente para alterar o modificar las mismas. En ausencia de circunstancias extremas que indiquen lo contrario, los foros apelativos estamos obligados a presumir la

corrección de las determinaciones efectuadas por el magistrado de instancia.

Claro está, tales determinaciones no son inmutables, pues el arbitrio del juzgador, aunque respetable y merecedor de deferencia, no es absoluto. La apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. Por ello, aun en las situaciones en que exista prueba que sustente las determinaciones de hechos del foro sentenciador, si del análisis de la totalidad de la prueba aportada surge que dichas determinaciones no constituyen el análisis más justo y racional de la evidencia, los foros apelativos considerarán tales determinaciones como totalmente erróneas. *Méndez Rodríguez v. Morales Molina, supra.* Véase, además, *Rivera Pérez v. Cruz Corchado, supra.*

De otra parte, la regla de deferencia o *"conclusividad"* antes mencionada no es de aplicación a la evaluación de la prueba documental. Esto es así, por entenderse que los tribunales apelativos están en igual situación que la sala sentenciadora para evaluar dicha evidencia, ya que en la misma están ausentes los mencionados elementos expresionales que hacen más o menos creíbles los testimonios orales. *Díaz García v. Aponte Aponte*, 125 D.P.R. 1, 13-14 (1989); *Torres Arzola v. Policía de P.R.*, 117 D.P.R. 204, 213 (1986); *Sanabria v. Sucn González, supra,* pág. 995. Así, las determinaciones de hechos fundamentadas en prueba documental **no** están cobijadas por la aludida norma de deferencia y pueden ser alteradas por el foro apelativo aun en ausencia de circunstancias extraordinarias. En cambio, las determinaciones de hechos fundamentadas tanto en testimonios orales como en documentos públicos o privados, deposiciones o estipulaciones, aunque no les aplica en su totalidad la norma de conclusividad, únicamente podrán ser alteradas en caso de un conflicto irreconciliable entre la prueba testifical y la prueba documental. *"Claro es, que en aquellos casos en que la supremacía de la evidencia oral se manifiesta, y el conflicto entre los testimonios irreconciliables ha sido resuelto por el juez, aceptando la versión de una de las partes, la regla de conclusividad se aplica sin reserva alguna, a menos que no resulte contraria al orden natural de las cosas o al orden racional de la inteligencia humana." Id.,* pág. 996.

### III

El Artículo 2 de la Ley Núm. 80 de 30 de mayo de 1976 (*"Ley 80"*), 29 L.P.R.A. sec. 185b, dispone, en su parte pertinente, que se entenderá por justa causa para el despido de un empleado:

*"(a) Que el obrero siga un patrón de conducta impropia y desordenada.*

*(b) La actitud del empleado de no rendir su trabajo en forma eficiente o hacerlo tardía y negligentemente en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.*

*(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento, siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.*

*(d) Cierre total, temporero o parcial de la operaciones del establecimiento.*

*(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y en los cambios en los servicios rendidos al público.*

*(f) Reducciones en el empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido."*

El precepto antes transcrito no es una lista taxativa de circunstancias que constituyen justa causa para el despido, ya que *"...la ley no pretende ni puede, considerada la variedad de circunstancias y normas de los múltiples establecimientos de trabajo, ser un código de conducta conteniendo una lista de faltas claramente*

*definidas y la sanción que corresponde a cada una y en cada instancia, si ha de ser reprimenda, suspensión o despido. Esa es la opción del patrono que puede adoptar reglas y reglamentos razonables que estime necesarios para el funcionamiento de la empresa."* Srio. del Trabajo v. I.T.T., 108 D.P.R. 536, 542 (1979).

La Ley 80, *supra*, no favorece el despido de un empleado como sanción a la primera falta. A tenor con el estatuto, únicamente es permisible el despido por primera o única ofensa en aquellas ocasiones en que la misma es *"...de tal severidad o naturaleza que revele una actitud o detalle de su carácter, tan lesivo a la paz y al buen orden de la empresa, que constituiría imprudencia esperar su reiteración para separarlo del establecimiento."* Delgado Zayas v. Hospital Interamericano, 137 D.P.R. 643, 650 (1994), citando a *Srio. del Trabajo v. I.T.T., supra*, pág. 544.

De otra parte y como es sabido, la Ley de Compensaciones por Accidentes del Trabajo pretende proteger a los trabajadores y procurarle tratamiento médico para los accidentes que sufran en el desempeño de sus labores. En particular, el Artículo 5a, 11 L.P.R.A sec. 7, persigue proteger al trabajador lesionado para que *"no tenga que confrontarse, además [del problema de la lesión y su recuperación], con la incertidumbre indeseable de que por haber sufrido un accidente, su patrono lo despida sin justa causa del empleo o que cuando éste regrese dado de alta no tenga trabajo."* Santiago v. Kodak Caribbean, LTD., 129 D.P.R. 763, 770 (1992). A tales efectos, dicho precepto, en primer lugar, le requiere al patrono reservar el empleo al obrero por doce meses, ▮ contados a partir de la fecha en que ocurrió el accidente. Durante esos doce meses, el patrono no puede despedir al empleado inhabilitado. En segundo lugar, tan pronto el obrero sea dado de alta, el patrono está obligado a reinstalarlo en su empleo, siempre y cuando cumpla con los requisitos establecidos. *Cuevas Santiago v. Ethicon*, opinión de 30 de junio de 1999, **99 J.T.S. 111**, pág. 1315; *Santiago v. Kodak Caribbean, LTD., supra*, págs. 769-770.

Para que un obrero incapacitado temporeramente como consecuencia de un accidente laboral tenga derecho a reinstalación en su empleo, el trabajador deberá establecer los siguientes requisitos: (1) que el accidente o enfermedad ocupacional inhabilite al empleado para trabajar; (2) que el empleado se acoja a los beneficios del Fondo; (3) que existe un vínculo obrero-patronal al momento en que el trabajador se reporta al Fondo; (4) que dentro de los quince días de haber sido dado de **alta definitivamente** y autorizado a trabajar por el Fondo, el empleado solicite al patrono reposición en su empleo; (5) que dicho requerimiento de reposición se haga dentro de los doce meses de haber ocurrido el accidente o enfermedad; (6) que al solicitar su reposición, el empleado esté mental y físicamente capacitado para desempeñarse en las funciones del empleo que ocupaba; y (7) que dicho empleo subsista al momento de la solicitud de reinstalación. Véanse *Cuevas Santiago v. Ethicon, supra*, pág. 1315; *Santiago v. Kodak Caribbean, Ltd., supra*, pág. 771.

## IV

Los apelantes sostienen que incidió el tribunal sentenciador al concluir que el despido del apelante Pagán Beauchamp estuvo justificado, que éste no sufría de incapacidad mental alguna previo al despido y que no tenía derecho a la reserva de empleo garantizada por la Ley de Compensaciones por Accidentes del Trabajo. Mediante estos señalamientos atacan la apreciación de la prueba efectuada por dicho foro.

En cuanto al primer asunto, sostienen tanto que no existió un patrón de ineficiencia por parte del Sr. Pagán Beauchamp como que la conducta en la que éste incurrió no es lo suficientemente detrimental al buen funcionamiento de la empresa como para justificar su despido. Arguyen que cometió grave error al concluir que el apelante *"...nunca pudo desempeñarse eficientemente en ninguna de sus posiciones en Hewllet Packard."* Escrito del Recurso, pág. 41. A favor de tal posición presentan su particular versión de los hechos relacionados al despido, según la cual el Sr. Pagán Beauchamp desempeñó eficientemente sus funciones por largos períodos de tiempo y no fue hasta poco antes de su despido que comenzó a confrontar problemas en el desempeño. Dicha interpretación choca con los hechos que el tribunal *a quo* concluyó como probados. Se determinó que mientras Pagán Beauchamp ocupó la plaza de analista de inventario nunca pudo adaptarse a la plaza como para rendir su

trabajo eficientemente. Así lo reflejan las evaluaciones que le hicieran sus supervisores. En la primera, realizada un año y tres meses después de que el apelante comenzara a ocupar el cargo, revela que éste todavía dependía del conocimiento y guías de su compañera de labores -Sonia Gutiérrez- para realizar labores que debía estar capacitado para efectuar solo. La segunda evaluación se hizo un año más tarde e indica que el apelante era incapaz de ejercer eficientemente sus funciones como analista de inventario. Como consecuencia de tales deficiencias, el 23 de julio de 1994, recibió una amonestación verbal de Michael Sykes, su supervisor.

En la evaluación del 13 de octubre de 1994, se descendió la clasificación ("*ranking*") del apelante a nivel uno y se consideró incluso despedirle, ya que había recibido una amonestación verbal y no había mostrado mejoría aún después de que se le descendiera la clasificación a uno. La compañía le ofreció tres opciones: (1) permanecer en su posición de analista de inventario y correr el riesgo de ser despedido, sino mostraba mejoría inmediata; (2) aceptar un descenso a una posición más sencilla; o (3) renunciar. Pagán Beauchamp aceptó el descenso. El 1° de abril de 1995, se le descendió al puesto de contador y pasó a ser supervisado por el Sr. David Bland.

El tribunal también concluyó que cuando el apelante pasó a ocupar la plaza de contador se observó una mejoría en el desempeño de sus funciones. En su próxima evaluación se le ascendió en clasificación a dos. En la evaluación de 23 de septiembre de 1996, se le ascendió a nivel tres. Más tarde, comenzó nuevamente a tener problemas en el cumplimiento de sus funciones. En particular, presentaba problemas en las presentaciones de fin de mes al resto del grupo, no tenía respuestas a las preguntas de sus compañeros y los números de totales de sus presentaciones no cuadraban. Los errores se repetían de mes a mes. Además, el Sr. Pagán Beauchamp era responsable de verificar gastos actuales y referirlos a una compañera -Claribel Rodríguez- para que ésta los reportara a la alta gerencia de la compañía. Pagán Beauchamp no entregaba a tiempo la referida información o la suplía incompleta, de forma que la Sra. Rodríguez en varias ocasiones confrontó problemas para efectuar los informes a la gerencia. A raíz de tales incumplimientos, el 7 de abril de 1997, se le dio una amonestación escrita. En la misma se enumeran las razones para tomar tal acción disciplinaria: (1) el incidente en el cual no proveyó a Claribel Rodríguez de los documentos necesarios para el informe a la alta gerencia; (2) la ineficiencia de informar conteos erróneos del personal de cada departamento, incluso varias versiones incorrectas para un mes; (3) no reconocer un error en el conteo del departamento de ingeniería, en el que duplicó la cantidad del personal; (4) el no proveer, ni en una ocasión, reportes de reconciliación de gastos correctos. Se le indicó a Pagán Beauchamp que como consecuencia de su deficiente desempeño se le bajó la clasificación a uno. Las determinaciones están fuertemente sustentadas por la prueba. Hemos considerado detenidamente la exposición narrativa de la prueba y la transcripción del testimonio que complementa la misma, y nada encontramos que mueva nuestro ánimo a alterar estas conclusiones del tribunal inferior. Resulta, por tanto, necesario sostener la determinación sobre la ineficiencia del apelante.

Asimismo, sostienen que el incidente protagonizado por el apelante con la Sra. Gutiérrez no fue de tal magnitud que justificara su despido. En específico, arguyen que *"...de acuerdo a la jurisprudencia, el análisis del despido por conducta impropia o desordenada presupone violaciones reiteradas, a pesar del patrono haberle manifestado que desaprueba dicho patrón de conducta o una falta mayor que revele en el empleado una actitud o un detalle en su carácter que resulta tan lesivo a la paz, la moral y el buen orden de la empresa que se justifica que no ... espere a que se repita el evento. (p. ej. Asesinar a otro empleado, agredir al patrono, una violación a una empleada, hurtar)."* Escrito del Recurso, pág. 43. Tal contención es inaceptable.

En primer lugar, los apelantes intentan restar importancia al hecho de que la conducta observada por el apelante es **impermisible en cualquier lugar de trabajo**. El día de su despido -5 de mayo de 1997-, Pagán Beauchamp se encontró con la Sra. Gutiérrez a quien comenzó a gritarle de forma agitada, haciéndole preguntas relativas a la forma en que la compañía la trató cuando ésta se reportó al Fondo. Le inquirió además su parecer acerca de los conocimientos técnicos del Sr. Sykes en el área de análisis de inventario. Cuando la Sra. Gutiérrez le indicó que creía que aquél no tenía muchos conocimientos en dicha área, el Sr. Pagán se exaltó aún más y comenzó a llamar a gritos al resto del personal pidiendo que escucharan lo que ella acababa de decir. La Sra.

Gutiérrez trató de alejarse y Pagán Beauchamp le impidió el paso, le agarró del brazo, acercándosele en extremo, y gritándole que le quería mucho. La Sra. Gutiérrez se sintió atemorizada. Claramente, el incidente en cuestión no es, como pretenden los apelantes, una simpleza o poca cosa.

En segundo lugar y con el ánimo de sustentar su contención, los apelantes incorrectamente arguyen que, a tenor con la jurisprudencia, para que una conducta amerite el despido como sanción a una primera o única ocurrencia, es necesario que la misma constituya delito. A manera de ejemplo, enumeran como causas que justificarían tal acción el asesinato, la agresión, la violación y el hurto. Indudablemente, estas son conductas lesivas al funcionamiento de una empresa, mas no es ese el grado de severidad jurídicamente requerido para la conducta en virtud de la cual se pueda despedir a una persona por un única ocurrencia. Resulta evidente que existen muchísimas conductas que, aun cuando no son de la magnitud de las señaladas por los apelantes, podrían afectar significativamente el funcionamiento de un negocio, incluida entre ellas aquélla en la que incurrió Pagán Beauchamp. Los ejemplos invocados por la parte apelante definitivamente son el *"extremo máximo"* de lo que una conducta inapropiada puede ser. Por ello, resulta absurdo exigir que, para que el patrono pueda tomar dicha acción correctiva, tenga que esperar a una situación de tal severidad que **sería más que negligente** por no haberla tomado antes. Aceptar la posición de los apelantes equivale a decir que el patrono sólo puede tomar una acción correctiva cuando la misma ya no tiene función alguna, toda vez que la situación ha degenerado a tal punto que es imposible corregirla. Esto es un sin sentido que no tiene cabida en el mundo del Derecho. Lo anterior nos convence de que la posición de los apelantes es insostenible y de que la conducta en que incurrió el Sr. Pagán Beauchamp es suficientemente lesiva al buen funcionamiento de la empresa como para justificar por sí misma el despido de éste.

Por otro lado, sostienen que erró el tribunal de instancia al determinar que, previo a su despido, el apelante Pagán Beauchamp no sufría de enfermedad mental alguna, ya que *"[c]laramente estableció Jesús Ramos en su tratamiento que a Enrique Pagán se le despidió porque estaba 'como loco' y no trabajaba ni dejaba trabajar a los demás."* Escrito del Recurso, págs. 44-45. Tal contención es totalmente incorrecta. Hemos examinado la transcripción del testimonio del Sr. Jesús Ramos **en su totalidad. En ninguna parte hemos encontrado tal aseveración. Simplemente eso no se atestó.** Además, los apelantes no aducen razones o circunstancias que denoten pasión, prejuicio, parcialidad o error manifiesto en la apreciación efectuada por el magistrado de instancia, por lo que es necesario sostener las determinaciones referentes a la salud mental del Sr. Pagán Beauchamp.

Los apelantes sostienen, además, que erró el foro inferior al concluir que el apelante Pagán Beauchamp no tenía derecho a una reserva de empleo garantizada por el Artículo 5a de la Ley de Compensaciones por Accidentes del Trabajo debido a que se reportó al Fondo luego de haber sido despedido. Los apelantes no cuestionan que Pagán Beauchamp acudiera al Fondo después de que fue despedido. Sin embargo, es su parecer que dadas las circunstancias particulares del presente caso, sería injusto exigir como requisito para dicha protección la subsistencia de un vínculo obrero-patronal al momento en que el trabajador acuda al Fondo, ya que el acto de despido y el de reportarse al Fondo se dan casi *"simultáneamente"*. Una vez más, los apelantes intentan introducir su particular versión de los hechos sobre aquélla que el foro sentenciador concluyó como probados. A tenor con interpretación de la parte apelante, la gerencia aprovechó que Pagán Beauchamp había abandonado los predios de la compañía para despedirle. La mañana siguiente, luego de que el apelante llamó para informar que pretendía reportarse al Fondo, es que le llaman para informarle del despido, y tan sólo una hora más tarde es que éste se presenta al Fondo. Lo anterior es la interpretación particular de dicha parte acerca de los hechos relacionados al despido.

Tal versión fue descartada por el foro de instancia, quien concluyó que los hechos relacionados al despido fueron de otra forma. Determinó que durante la última semana de abril de 1997, la gerencia de la compañía pautó una reunión para el 5 de mayo de 1997 para discutir el hecho de que luego de la amonestación Pagán Beauchamp no había mejorado en su desempeño y para atender las quejas de los compañeros de éste sobre sus cambios de

comportamiento. Cuando el gerente de personal -Sr. Ramírez- llegó a su oficina el 5 de mayo escuchó un mensaje en su grabadora, en el que el Sr. Pagán Beauchamp indicaba que Hewllet Packard iba a temblar. Ese día, cuando Pagán Beauchamp llegó a la compañía vio al Sr. Ramírez y sub-gerente de personal hablando entre sí, le gritó en forma agresiva y sobresaltada al primero de ellos "*me fallaste, me fallaste*". Posteriormente, se encontró con la Sra. Gutiérrez a quien comenzó a gritarle de forma agitada, haciéndole preguntas relativas a la forma en que la compañía la trató cuando ésta se reportó al Fondo. Le inquirió además su parecer acerca de los conocimientos técnicos del Sr. Sykes en el área de análisis de inventario. Cuando la Sra. Gutiérrez le indicó que creía que aquél no tenía muchos conocimientos en dicha área, el Sr. Pagán se exaltó aún más y comenzó a llamar a gritos al resto del personal pidiendo que escucharan lo que ella acababa de decir. La Sra. Gutiérrez trató de alejarse y Pagán Beauchamp le impidió el paso, le agarró del brazo, acercándosele en extremo, y gritándole que le quería mucho. La Sra. Gutiérrez se sintió atemorizada. Ésta informó el incidente a la gerencia de la compañía. Se decidió adelantar la reunión que tenían pautada para la tarde. En la misma estuvieron presentes, entre otros, los señores Ramírez y Ramos. Se analizó el expediente del Sr. Pagán y se concluyó que éste tenía un amplió patrón de problemas de desempeñó en su trabajo. Se consideró, además, la conducta intimidante y agresiva hacia la Sra. Gutiérrez. Se decidió despedirle y procedieron a preparar el formulario correspondiente. Luego de la reunión, el Sr. Ramírez buscó al Sr. Pagán para notificarle de su despido. No le encontró. A pesar de que el Sr. Pagán Beauchamp no se encontraba presente para notificarle de su despido, la compañía procedió con los trámites internos: desactivarle del sistema e informar a seguridad que no debían permitirle entrada a los predios al demandante. Inmediatamente se envió la carta de despido por correo certificado con acuse de recibo. En la tarde del 5 de mayo, el Sr. Ramos encontró un mensaje de voz del Sr. Pagán Beauchamp, en el que le indicaba que iba a un médico privado. Durante la noche de dicho día, el Sr. Pagán Beauchamp se personó a los predios de la compañía donde el celador le negó la entrada. A eso del mediodía del 6 de mayo de 1997, fue cuando el Sr. Ramos pudo finalmente informarle al Sr. Pagán Beauchamp que había sido despedido. Posteriormente, éste se reportó al Fondo. Nada se ha aducido que justifique alterar tales determinaciones. Se desprende de ellas que, contrario a lo que insinúan los apelantes, el despido del apelante y que éste se reportara al Fondo, no fueron actos simultáneos. Al menos pasó un día entre uno y otro incidente. Asimismo, surge que la apelada no postergó informarle de su despido para de forma abusiva privarle de los beneficios del Fondo. Tan pronto se tomó la determinación de despedirle se trató de notificarle. La dilación en informarle del despido no tenía el propósito de privarle de sus derechos, sino en que fue imposible conseguirle antes. El Sr. Ramos quería informarle al Sr. Pagán Beauchamp personalmente y, debido a la negativa de éste de comparecer a la compañía, se vió obligado a informarle por teléfono. Es entonces que el apelante señala que pretende acudir al Fondo. En resumen, no hay duda de que el apelante Pagán Beauchamp acudió al Fondo con posterioridad a que finalizara el vínculo obrero-patronal que existía entre él y la apelada, de forma que el correctamente concluyó el foro de instancia que aquél no tenía derecho a la reserva de empleo provista por la Ley de Compensaciones por Accidentes en el Trabajo.

## V

Por último, señalan los apelantes que el foro *a quo* incidió al desestimar la causa de acción por daños y perjuicios incoada por la Sra. Avilés Ramos. Discrepamos.

Dicha acción es accesoria a la acción por despido injustificado y discriminatorio instada por el Sr. Pagán Beauchamp. Por ello, para que la apelante Avilés Ramos pueda obtener una indemnización por los daños propios es necesario que se establezca primero el despido injustificado y discriminatorio de aquél. Cf. *Santini Rivera v. Serv. Air, Inc.*, 137 D.P.R. 1, 14 (1994). Dicho de otra forma, para que la acción de la Sra. Avilés Ramos prosperara era imprescindible que la acción primaria tuviera éxito. De no prosperar la acción por despido injustificado y discriminatorio, tampoco procedía la acción por daños instada por la apelante Avilés Ramos. Dado que la acción primaria por despido injustificado y discriminatorio no progresó, fue correcta la determinación del tribunal sentenciador de desestimar la acción accesoria por daños y perjuicios.

## VI

Por los fundamentos previamente consignados, se confirma la sentencia apelada.

Notifíquese.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau<br>
Secretaria General

### ESCOLIOS 2002 DTA 84

**1.** Los errores señalados literalmente leen:

*"Erró el Tribunal de Primera Instancia, Sala Superior de Aguadilla, al determinar que el demandante fue despedido justificadamente de su empleo por seguir un patrón de conducta impropia o desordenada y por su actitud de no rendir trabajo en forma eficiente.*

*Erró el Tribunal de Primera Instancia, Sala Superior de Aguadilla, al determinar que previo al despido, el demandante no sufría de una enfermedad significativa alguna por lo que no le cobija el Americans with Disabilities Act ni la Ley Núm. 44 de Protección a Personas con Impedimentos y que no hubo ánimo discriminatorio en el despido del demandante.*

*Erró el Tribunal de Primera Instancia, Sala Superior de Aguadilla, al determinar que el psiquiatra del demandante, Dr. Fernández, que se presentó como perito a la vista, diagnóstico que el demandante sufría meramente un 'Desorden de Ajuste' no cubierto por las leyes que protegen a las personas con incapacidad física y/o mental.*

*Erró el Tribunal de Primera Instancia, Sala Superior de Aguadilla, al determinar que no le cobija la protección del Art. 5A de la Ley de Compensaciones por Accidentes del Trabajo porque ya estaba despedido cuando se presentó físicamente al Fondo del Seguro del Estado.*

*En consecuencia, erró el Tribunal de Primera Instancia, Sala Superior de Aguadilla, al desestimar la causa de acción de la esposa del demandante Hilda Avilés bajo el Artículo 1802 del Código Civil."*

**2.** El término de doce meses para reservar el puesto de trabajo a un obrero lesionado equivale a trescientos sesenta días y no a un año o trescientos sesenta y cinco días. *Torres v. Star Kist Caribe, Inc.,* 134 D.P.R. 1024, 1034 (1994), nota al calce número 4. *Santiago v. Kodak Caribbean, LTD., supra,* pág. 771. Este término es de caducidad, por lo que no puede interrumpirse de ninguna forma. *Cuevas Santiago v. Ethicon, supra,* pág. 1316; *Segarra Hernández v. Royal Bank de P.R.,* opinión de 1 de abril de 1998, **98 J.T.S. 37,** pág. 750.

**3.** Dicho requisito se establece en *Santiago v. Kodak Caribbean, Ltd.,* 129 D.P.R. 763, 771 (1992), donde se indica que *"[l]a protección provista por el Artículo 5 A de la Ley de Compensaciones por Accidentes del Trabajo supone, a nuestro juicio, que el empleado se acoja a los beneficios de la Ley, vigente el vínculo obrero-patronal. Ello lleva implícito el deber de informar el accidente antes de la ruptura o terminación de dicho vínculo."*